IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ADRIAN ALVAREZ, #74026-279,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RWT-14-1044 |
| **TIMOTHY STEWART, et al.,** | * | |
| Defendants. | * | |

## MEMORANDUM OPINION AND ORDER

On April 4, 2014, self-represented Plaintiff Adrian Alvarez filed this Complaint against Defendants Warden Timothy Stewart, Health Services Administrator Richard Shook, and Clinical Director Dr. Mohammad Moubarek (collectively "Defendants"), alleging inadequate medical care at the Federal Correctional Institution in Cumberland, Maryland ("FCI") where he is incarcerated.  ECF No. 1; ECF No. 4-2.  On August 21, 2014, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  ECF No. 9.  Alvarez responded in opposition on September 9, 2014, ECF No. 11, and Defendants replied in support on September 26, 2014, ECF No. 12.  The Court has reviewed the motions, related memoranda, and applicable law.  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2014).  For reasons to follow, Defendants' Motion for Summary Judgment will be GRANTED.

### BACKGROUND

Before his incarceration, Alvarez was injured in an accident in Mexico in 2009.  ECF No. 1, at 3.  His injuries rendered him paralyzed with permanent damage to his lower extremities, and as a result he had a posterior spinal fusion that contained hardware.  *Id.*  He claims his medical providers in Mexico told him there was a chance he would walk again if

provided proper physical therapy. *Id.* Alvarez arrived at FCI on April 15, 2011. He claims that hardware repair surgery performed in August 2012 was necessitated by a series of falls he sustained in the spring and early summer of 2012. ECF No. 1, at Ex. A, p. 3. Alvarez posits that if he had been provided the physical therapy he had requested to help him walk again, he would not have fallen. *Id.* As relief he asks this Court to "resolve this matter and give [him] proper medication." ECF No. 4, at 3.

On April 4, 2014, Alvarez filed this action pursuant to 42 U.S.C. § 1983. ECF No. 1, at 1. However, a federal defendant is the proper subject of a *Bivens* claim, not a § 1983 claim. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Recognizing that Alvarez is proceeding *pro se*, the Court shall construe his claims as filed pursuant to the ruling in *Bivens*. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978); *see also Cash v. United States*, 2012 WL 6201123, at *9 (D. Md. Dec. 11, 2012) (noting that the Court has the authority to "recharacterize the claims as under *Bivens*"); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (maintaining liberal construction accorded to *pro se* complainant).

### I. Defendants' Response

In support of the Motion for Summary Judgment, Defendants have filed copies of Alvarez's medical records and Defendants' declarations. Defendants assert that Alvarez did not suffer injuries as a result of any falls in the spring and summer of 2012, and that Alvarez's back surgery was a consequence of an infection he contracted in late July of 2012 from a tattoo. ECF No. 9-2, ¶ 9. Further, Defendants contend that Alvarez received timely, appropriate, and thorough medical treatment at FCI, and that he cannot establish Defendants were deliberately indifferent to his medical needs.

Upon his arrival at FCI in 2011, Alvarez requested physical therapy sessions to help him walk again. Dr. Moubarek determined Alvarez was not a candidate for physical therapy due to the age of the injury, and because Alvarez never evidenced any active movement in his legs for therapy to strengthen. ECF No. 9; ECF No. 15-2, ¶ 6; ECF No. 9-15, ¶ 4; ECF No. 12-1, ¶ 2. Dr. Moubarek instead gave Alvarez exercises to perform independently in order to strengthen his upper body. *Id.*

Between January 2012 to July 2012, Alvarez complained twice about lower back pain, which he attributed to a self-reported fall that occurred in April 2012. Alvarez first reported back pain to Health Services staff on May 22, 2012, when he complained of a grinding sensation in his back since falling the previous month while transferring to his wheelchair in the shower. ECF No. 9-5. Based on this grievance, medical staff evaluated Alvarez and administered an x-ray on May 23, 2012. The x-ray results revealed no orthopedic hardware failure or new fracture in his lower back. ECF No. 9-6.

On June 4, 2012, Alvarez was seen in Health Services for a follow-up visit, and for the second time reported lower back pain. ECF No. 9-7. FCI medical staff ordered a CT scan. The CT examination was performed on June 12, 2012, and revealed no new injuries or fractures to his spine. ECF No. 9-8.

On July 21, 2012, Alvarez was seen in Health Services for complaints of a lump on his lower back. ECF No. 9-10. Physical examination revealed a large area of swelling at the lumbar area of his back. *Id.* Alvarez did not report any recent injury or trauma to his lower back. *Id.* During examination, it was observed that Alvarez had a freshly darkened tattoo on his right lower extremity surrounded by reddened skin. *Id.* X-rays and labs tests were taken, and the laboratory results revealed abnormally elevated white blood cells, suggesting an infection.

ECF No. 9-11.  The x-ray results were abnormal, indicating a potential hardware failure.  *Id*.  The abnormal x-ray finding was new when compared to a previous x-ray taken on May 23, 2012.  ECF No. 9-12.  The medical chart indicates that the treating physician discussed Alvarez's condition with Dr. Moubarek and Shook, and that arrangements were made to transfer Alvarez to the Emergency Department at the University of West Virginia for continued management.  ECF No. 9-11.

Alvarez was admitted to West Virginia University Hospital on July 25, 2012.  Hospital records dated July 27, 2012, show he was admitted with likely infection and hardware failure.  ECF No. 9-13, at 1.  Alvarez told hospital medical staff he had no pain, but could only feel the top half of his surgical wound as well as the mass.  *Id*.  Alvarez reported that his CT and x-rays in June 2012 had shown "no hardware issues" and that everything "looked good."  *Id*.  The hospital report noted that Alvarez had received a "homemade tattoo" about one month earlier.  *Id*.  Surgery was performed on Alvarez because "existing hardware had to be removed, along with surgical debridement and installation of new hardware to resolve the infection."  ECF No. 9-2, ¶ 10; *see also* ECF No. 9-14.  In his declaration, Dr. Moubarek attests the "tattoo was most likely the source of the infection, which ultimately caused the hardware failure."  ECF No. 9-2, ¶ 10.  There were no complications from the hardware surgery.  *Id.* ¶ 11.

On August, 8, 2012, Alvarez returned to FCI where he received intravenous antibiotics and follow-up care.  ECF No. 9-14.  Alvarez indicated there was a dull pain in his back along the incision site.  *Id*. at 4.  ECF No. 9-2, ¶ 11.  On August 22, 2012, Alvarez was transferred to the Federal Medical Center at Butner, North Carolina ("Butner"), for long-term intravenous antibiotic therapy. Plaintiff returned to FCI when he completed his course of antibiotics on February 1, 2013.  ECF No. 1-1, at 3.

Subsequently, Alvarez filed a claim under the Federal Tort Claims Act, 28 U.S.C. § 2671, for damages resulting from the infection and failure of hardware, claiming his injuries were the result of his fall from a wheelchair and that he received inadequate treatment. ECF No. 1-2. The claim was denied on October 18, 2013, after a determination that Alvarez had received appropriate treatment. *Id*. It was further determined that the failure of the hardware was not due to a fall as claimed, but due to a "methicillin-resistant staphylococcus aureus" infection contracted from the tattoo. *Id*.

In his declaration, Richard Shook attests that as Health Services Administrator at FCI he does not "examine, diagnose, or treat inmates' medical conditions." ECF No. 9-15, ¶ 3. Shook's role is limited to "supervising the clinicians" who provide medical care to inmates. *Id*. Shook attests that "[w]hile [he] facilitated some of Plaintiff's medical visits and procedures, [he] did not provide him with medical diagnosis or treatment." ECF No. 9-15, ¶ 4. Shook explains,

> With respect to Plaintiff's current allegations, I am aware that Plaintiff believed that physical therapy would allow him to walk again. However, based on the Clinical Director's assessment, it was determined that Plaintiff was not a candidate for physical therapy sessions with a therapist because he never evidenced any active movement in his legs. The decision as to whether or not Plaintiff needed physical therapy was not my decision because I was not his treating physician.

*Id*.

In his declaration, Warden Stewart states he is not "personally responsible for the medical screening, diagnosis, or treatment of the inmates at the institution." ECF No. 9-16, ¶ 3. Stewart attests that he defers to the opinions and expertise of medical professionals within Health Services concerning inmate medical treatment, and denies any involvement in Alvarez's diagnosis and treatment. *Id*.

## II. Plaintiff's Opposition

Alvarez argues in his opposition that his hardware repair surgery was not the result of a blood infection, but a lack of physical therapy. ECF No. 11, at 1. Additionally, he claims that he received inadequate medication for his pain. *Id*. at 2. Specifically, Alvarez complains that he was prescribed Elavil, a drug used to treat mental illness, and that he suffered an allergic reaction. Alvarez also contends his medical needs warrant his designation to a Care Level 3 institution. Lastly, he claims he is entitled to more physical therapy than just "boot therapy" or performing exercise with his boots. *Id*.

## III. Defendants' Reply

Defendants' Reply is supported by Dr. Moubarek's supplemental declaration, in which he attests Alvarez does not meet the criteria for designation to a Care Level 3 medical facility. ECF No. 12-1, at ¶¶ 1–3. Prior to his designation to FCI, a Care Level 2 institution, the Bureau of Prisons' ("BOP") Office of Medical Designation evaluated Alvarez and concluded he was appropriate for assignment to Care Level 2. The majority of BOP institutions are designated as Care Level 2 institutions and handle the majority of complicated medical issues. ECF No. 12-1, ¶ 2. Moubarek also states,

> Plaintiff suffers from paraplegia otherwise known as paralysis in both of his lower extremities due to an automobile accident he suffered prior to his designation to Bureau custody. After the first few months following the injury to his spinal column, paralysis becomes permanent. Whatever improvement the patient has during the first few months following the incident, is the only improvement the patient will ever recover. Furthermore, in general, patients who suffer from spinal cord injury do not suffer a great deal of pain because they have extensive nerve damage and extensive loss of sensation and do not have any feeling in their lower extremities.

ECF No. 12-1, ¶ 2.

> Plaintiff has chronic nerve damage to his lower extremities. Due to the permanent nerve damage to his legs and the fact that Plaintiff is well outside the initial

recovery phase of his condition, he does not require lifelong physical therapy for his legs. As stated previously, once Plaintiff arrived at FCI, he requested physical therapy sessions because he believed, contrary to the standard medical fact, it would help him walk again. However, Plaintiff was not then, nor is he now, a candidate for physical therapy sessions due to the age of his spinal injury and the fact that he still has never evidenced any active movement in his legs. If there is no active movement in Plaintiff's legs, there will be no available muscles for therapy to strengthen.

*Id*. ¶ 7.

Regarding pain medication, Dr. Moubarek attests Alvarez received Elavil (for possible depression and possible nerve pain) and Naprosyn (for pain as needed). While Alvarez was at Butner for treatment of bone infection, he received narcotic medication for acute pain management. *Id*. ¶ 4. Alvarez did not require extensive pain management once the bone infection resolved through antibiotic treatment. *Id*. At Butner, Alvarez was given a prescription for Neurontin for his complaint of nerve pain. *Id*. Dr. Moubarek states that "[a]lthough patients who suffer from permanent nerve damage do not typically experience any nerve pain, [Alvarez] was issued the pain medication. *Id*.

According to Dr. Moubarek, Alvarez's complaints of lower back pain lack objective findings. *Id*. ¶ 5. Notably, Alvarez has never told FCI medical providers that the Elavil fails to alleviate his pain or gave him an allergic reaction. *Id.* In this regard, Dr. Moubarek explains that because Elavil has the potential for drug abuse, it is distributed only on the pill line rather than allowed to be kept on the inmate's person. Before it is administered to inmates, Elavil is crushed and dissolved in water. A nurse observes the inmate's consumption of the medication. At no time has Alvarez refused to take Elavil. There is no record that Alvarez has suffered an allergic reaction to Elavil. *Id*.

7

## ANALYSIS

Defendants seek summary judgment in their favor on several grounds: 1) they are not amenable to suit in their official capacities and the relief sought is not available in a *Bivens* action; 2) Shook and Stewart were not personally involved in the matters alleged; 3) respondeat superior is not available in a *Bivens* action; 4) Alvarez fails to establish requisite deliberate indifference; and 5) qualified immunity.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Disputes of material fact are genuine if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In order to avoid summary judgment, the nonmoving party "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). While the Court must view the evidence in the light most favorable to the nonmoving party, *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 302 (4th Cir. 2006), it must also "prevent factually unsupported claims and defenses from proceeding to trial," *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted). Against this legal standard, the Court examines Defendants' defenses and arguments.

I.   **Sovereign Immunity**

When an individual is sued in his official capacity, the suit is essentially against the governmental entity. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (noting that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Absent waiver, sovereign immunity shields a governmental entity from suit. *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). "While *Bivens* actions allow for recovery of money damages against federal officials who violate the United States Constitution in their individual capacities, *Bivens* does not allow for recovery of money damages, or suits in general, against the government itself . . . . [T]he United States has not waived sovereign immunity in suits claiming constitutional torts . . . ." *Reinbold v. Evers*, 187 F.3d 348, 355 n.7 (4th Cir. 1999); *see also Chiang v. Lappin*, RDB-07-1017, 2008 WL 2945434, at *5–6 (D. Md. July 24, 2008) (dismissing *Bivens* claims against defendants in their official capacities on sovereign immunity grounds). Here, Alvarez provides no evidence sovereign immunity is waived. Thus, Defendants are entitled to summary judgment in their favor regarding all claims against them in their official capacities.

II.   **Amenability to Suit Under *Bivens***

The remedy in a *Bivens* action is money damages. *See Bivens*, 403 U.S. at 395–97; *see also Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) ("A *Bivens* action is a judicially created damages remedy designed to vindicate violations of constitutional rights by federal actors."). Alvarez however, seeks injunctive relief whereby he asks this Court to "resolve this matter and give [him] the proper medication [he] need[s]." ECF No. 4, at 3. The Fourth Circuit has ruled that a government official cannot be sued in his or her individual capacity in an action for

equitable relief. *See Kirby v. City of Elizabeth,* 388 F.3d 440, 452 n.10 (4th Cir. 2004) (stating injunctive relief can be awarded against the government officials only in their official capacities). Further, in their personal capacities, Defendants are not able to provide recourse for the harms alleged. Here, Alvarez cannot maintain claims for equitable relief against Defendants in their personal capacities. Absent a jurisdictional basis for injunctive relief against Defendants in their individual capacities, Defendants are entitled to summary judgment in their favor.

### III. Lack of Personal Involvement

Liability in a *Bivens* action is based on each defendant's personal constitutional violations. *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). In this case, Alvarez fails to particularize how either Shook or Stewart committed a constitutional violation. Indeed, Alvarez does not claim that Stewart was even aware of any decision concerning his medical care. Shook and Stewart attest they are not responsible for medical diagnosis or treatment of inmates at NBCI. ECF No. 9-15; ECF No. 9-16. Stewart states he relies on clinicians in the Health Services Department to provide inmate medical care, and he did not participate in decisions about Alvarez's physical therapy or surgery. *Id*. As Health Services Administrator, Shook's role is limited to supervising clinicians. ECF No. 9-15, ¶ 3. Shook facilitated some of Alvarez's medical visits and procedures. *Id*. Based on Dr. Moubarek's medical evaluation, it was determined that Alvarez was not a candidate for physical therapy. Shook did not make the decision because he was not Alvarez's treating physician. ECF No. 9-15, ¶ 4.

Non-medical prison personnel are entitled to reply on the opinion of the medical staff as to the proper course of inmate treatment. *Miltier v. Born*, 896 F.2d 848, 854–55 (4th Cir. 1990). Shook and Stewart were not personally involved in Alvarez's medical care. As such, they are entitled to summary judgment in their favor.

**IV.     Respondeat Superior**

A *Bivens* action may not be premised upon a respondeat superior theory.  *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Danser v. Stansberry*, No. 13-1828, 2014 WL 2978541, at *7 (4th Cir. July 3, 2014) ("[G]overnment officials cannot be held liable in a *Bivens* case under a theory of respondeat superior for the actions of their subordinates."); *Trulock*, 275 F.3d at 402.  "In a . . . *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Trulock*, 275 F.3d at 402.

Alvarez does not allege and the record does not suggest grounds to establish supervisory liability.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (imposing liability on a supervisor requires evidence of actual or constructive knowledge that (1) a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered).  Alvarez makes no allegations of documented practices to show that either Stewart or Shook tacitly authorized constitutionally offensive conduct of subordinates.  *Id.*  Neither Stewart nor Shook can be held vicariously liable for the actions about which Alvarez complains.  Accordingly, they are both entitled to summary judgment in their favor.

## V. Deliberate Indifference

In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amount to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). Deliberate indifference to a serious medical need requires proof that (1) objectively, the prisoner plaintiff was suffering from a serious medical need; (2) subjectively, the prison staff were aware of the need for medical attention; and (3) failed to either provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

"Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994). "Compelling a showing of significant physical or emotional harm, or a grave risk of such harm, infuses an element of objectivity into the analysis, lest resolution of the seriousness of a deprivation devolve into an application of the subjective views of the judges deciding the question." *Strickler v. Waters*, 989 F. 2d 1375, 1379–80 (4th Cir. 1993). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). Prison officials charged with deliberate indifference to a

serious medical need, must "know of and disregard the objectively serious condition, medical need, or risk of harm." *Shakka v. Smith*, 71 F. 3d 162, 166 (4th Cir. 1995).

The Court will assume Alvarez's medical condition constitutes a serious medical need for the purpose of Eighth Amendment deliberate indifference analysis.  However, Alvarez fails to show that any Defendant acted with a sufficiently culpable state of mind in light of those needs. After first presenting complaints of back pain from a fall, Alvarez received a physical exam and diagnostic studies including CT scans and x-rays.  The diagnostic tests produced no abnormal findings.  When Alvarez later went to Health Services for a lump on his back, tests revealed an elevated white cell count and potential hardware problems, and he was admitted to the hospital for surgery.  Upon his return to FCI, Alvarez's infection was treated with intravenous antibiotic therapy.  Later, his antibiotic treatment was continued at Butner.

Alvarez's medical record belies his contention that his surgery was necessitated by falls, as the record strongly suggests the infection was introduced by a tattoo.  Furthermore, Alvarez's disagreement over the cause of his hardware problems does not amount to a constitutional violation.  Alvarez's claims for physical therapy and pain medication represent a difference of opinion with his medical providers about the course of his treatment, and as such, does not establish requisite deliberate indifference necessary to support an Eighth Amendment claim.  *See Russell,* 528 F.2d at 319 (4th Cir. 1975); *Donlan*, 662 F. Supp. at 361. Similarly, Alvarez's assertion that he belongs in a Care Level 3 institution does not show Defendants acted with deliberate indifference to his needs; rather, it merely reflects a difference of opinion with the medical practitioners who evaluated his case.  Alvarez is unable to establish that Defendants knew of and disregarded an excessive risk to his health or safety in violation of his rights under the Eighth Amendment.  Even when the facts are viewed in the light most favorable to Alvarez,

he has failed to demonstrate any genuine issues of material fact in dispute, and thus Defendants are entitled to summary judgment in their favor as a matter of law.

Accordingly, it is, this 25th day of March, 2015, by the United States District Court for the District of Maryland,

**ORDERED**, that Defendants' Motion to Dismiss or, in the Alternative Motion for Summary Judgment (ECF No. 9) is hereby **GRANTED**; and it is further

**ORDERED**, that judgment for costs is hereby **ENTERED** in favor of all Defendants; and it is further

**ORDERED**, that the Clerk is hereby **DIRECTED** to close this case; and it is further

**ORDERED**, that the Clerk is hereby **DIRECTED** to mail a copy of this Order to Plaintiff and Counsel of Record.

/s/
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE